IN THE COURT OF APPEALS OF TENNESSEE
WESTERN SECTION AT NASHVILLE
_____

| | |
|---|---|
| LESSIE BLANKENSHIP, | Bedford Circuit |
| | No. 6860 |
| Plaintiff/Appellee. | C.A. No. 01A01-9504-00137 |
| VS. | Hon. Lee Russell |
| | Judge |
| CENTURY HEALTH SERVICES, INC. | |
| Defendant/Appellant. | |

**FILED**

**Dec. 15, 1995**

**Cecil Crowson, Jr.**
Appellate Court Clerk

CHARLES RICH, Bobo, Hunt & Bobo, Shelbyville
WILLIAM P. SURIANO, Riverside, Illinois, Pro Haec Vice
Attorneys for Defendant/Appellant.

ANDREW RAMBO, Bomar, Shoffner, Irion & Rambo, Shelbyville
Attorney for Plaintiff/Appellee

*AFFIRMED IN PART, REVERSED IN PART AND REMANDED*

Opinion Filed:
_____

**TOMLIN, Sr. J.**

Lessie Blankenship ("plaintiff") filed suit in the Circuit Court of Bedford County against Century Health Services, Inc. ("Century" or "defendant"), seeking damages for breach of a commercial lease. Following a bench trial, the court awarded plaintiff damages in the amount of $44,943.80 for rent due under the lease, costs incurred by plaintiff in seeking to relet the premises, and attorney fees in the amount of 15% of the amount of the judgment. On appeal, Century presents five issues for review: Whether the trial court erred (1) in finding that Century had assumed the lease between plaintiff and South Central Home Health, Inc. (?South Central"), the original lessee; (2) in concluding that Century had not properly terminated the lease; (3) in finding that plaintiff had properly mitigated her damages; (4) in awarding plaintiff damages for future rent under the lease; and (5) in awarding plaintiff attorney fees in the amount of 15% of plaintiff's judgment. For the reasons hereinafter stated, we affirm in part, reverse in part and remand.

1

For the most part the underlying facts are not in dispute. In January 1992, plaintiff and South Central entered into a written lease for a commercial building owned by plaintiff in Shelbyville for use as a home health care facility. The term of the lease was to expire on December 31, 1995. At the time the parties entered into the lease, plaintiff was an employee of defendant. In early 1993, defendant purchased certain assets of South Central and continued to operate a home health facility in the leased premises. Although defendant did not enter into a lease agreement with plaintiff, it continued to pay rent to plaintiff pursuant to the terms of South Central's lease.

In March 1993, defendant terminated plaintiff's employment. Defendant first began to complain about reported problems with the leased premises to plaintiff in August of that year. Specifically, defendant reported problems with insect infestation in the building along with a low electrical voltage on the right side of the premises. In response to these complaints, plaintiff employed a pest control service and a Nashville contractor to attempt to correct the problems.

On September 24, 1993, the building code enforcer for the City of Shelbyville notified defendant that the following alleged violations of the Standard Existing Building Code had been detected in the leased premises and that they required correction as soon as possible:

> 1. Electrical - The panel box has plenty of space yet all electrical circuits are tied into only two (2) breakers and this is not adequate to carry the computer load.
> 2. The building has no exit signs and no emergency lighting.
> 3. The floor in the vault area needs some attention. (It is a tripping hazard.)
> 4. Steps going into the rear storage room are unstable and need to be secured.
> 5. The building needs a handrail
> 6. The rear door of the storage room allows water to enter the building. This needs to be fixed.

Defendants regional administrator immediately wrote plaintiff on September 30, 1993, demanding that the code violations as stated be corrected by plaintiff no later than

2

Monday, October 4, or defendant would vacate the premises. Plaintiff received the letter on October 5. On the following day, plaintiff faxed a letter to defendant informing it that she had employed a contractor to correct the code violations the following week. After the contractor failed to complete the repairs as stated, plaintiff again wrote defendant on November 17, 1993 to assure them that the work would be completed within thirty (30) days or another contractor would be employed.

On November 29, 1993, defendant advised plaintiff that due to her failure to "meet the terms of the lease" defendant would treat the lease as no longer being in effect, and that its occupancy of the premises would continue on a month-to-month basis. Shortly thereafter, on December 9, 1993, the building code inspector again wrote to defendant concerning the code violations. In his letter he noted that while some of the violations had been corrected, the electrical problems had not. The inspector demanded that the defendant correct these electrical problems within ten (10) days or steps would be taken by the city to "make the building safe," which included the possibility of cutting off the power to the building. In this communication the inspector also noted, for the first time, that the rear basement wall to the building had some structural damages as a result of water leakage and required immediate attention.

Four days later on December 13, 1993 defendant's chief financial officer wrote plaintiff demanding to know by the following day whether plaintiff would fix the structural damage as noted in the building inspector's letter. After plaintiff failed to meet defendant's demand, on December 16, 1993 defendant further informed plaintiff that it would terminate the lease and vacate the premises on January 9, 1994. This threatened action was then carried out by defendant.

The trial court issued its memorandum opinion shortly after the hearing. The court found that defendant had, by its conduct, become a party to the lease and was therefore bound by its terms. The court also held that plaintiff's failure to correct the building code violations was not a substantial breach of the lease but was merely a pretext for defendant

3

to attempt to void the lease. The court awarded plaintiff a judgment against defendant in the amount of $39,050 as damages for rent in the amount $1,650 per month upon the date of breach until the date of the award, and $1,650 per month as rent from the date of the award until the end of the lease period. In addition, plaintiff was awarded costs incurred in connection with her attempt to relet the premises in the amount of $31.65 and attorney fees of fifteen percent (15%) of the judgment, amounting to $5,862.15.

## I. The Issue of Defendant's Liability Under the Lease

This court is of the opinion that defendant's first two issues can be considered together and at the same time stated a bit differently—that is, whether the evidence preponderates against the finding of the trial court that defendant was liable to plaintiff under the terms of the lease agreement originally entered into between plaintiff and South Central. Defendant contends that it did not assume the lease in existence between plaintiff and South Central, and even if they had assumed same, plaintiff's failure to correct the building code violations justified defendant's termination of the lease.

Our scope of review on appeal is de novo upon the record in the trial court. Findings of fact by the trial court come to this Court with a presumption of correctness. Absent an error of law, unless we find that the evidence presented to the trial court preponderates against these findings, we must affirm. T.R.A.P. 13(d).

In finding defendant liable to plaintiff under the lease, the trial court stated in relevant part as follows:

> The first question to be decided is whether or not the Defendant became a party to the lease and was bound by its terms. Clearly the Defendant believed itself to be a party, acted as though it were a party, benefitted under the lease as if it were a party, and demanded on its own behalf that the Plaintiff meet her obligations to the Defendant under the lease . . . . It is untenable for the Defendant to deny that it was subject to a lease agreement after it had occupied premises [sic] pursuant to the lease, paid rent pursuant to the lease, made demands under the terms of the lease, and purported to convert and then terminate the lease.

4

The record reflects that defendant, after purchasing some of the assets of South Central, went into possession of plaintiff's premises under South Central's lease and continued to occupy the premises for the purposes for which it was initially leased. In a letter to plaintiff dated August 1993, defendant stated in part as follows:

> This letter is to inform you of several problems with the building leased by <u>Century Home Health Care of South Tennessee, Inc.,</u> located at 107 East Holland Street. . . . (Emphasis added.)
>
> . . . .
>
> The building is not suitable in its current condition for continued use by Century Home Health. You are hereby requested, to correct the above problems within 30 days from the date of this letter. If corrections are not made, we will be forced to evacuate the building.

On September 24, 1993, the Codes Enforcement Office of the City of Shelbyville wrote to defendant's administrator stating, "after inspecting the building you occupy [107 E. Holland Street] . . . the following is a list of problems we found that will need to be corrected . . . . "

A letter from defendant's regional administrator dated September 30, 1993 states in part:

> This letter is a follow-up of Mr. Ed Augustine's letter dated August 9, 1993, identifying deficiencies and hazards in the building leased by Century Home Health Care of South Tennessee, Inc., located at 107 E. Holland Street.

This letter also threatened that if certain corrections of the deficiencies were not carried out within a specific time, Century would "begin evacuation of this building."

A portion of the letter dated November 29, 1993 from an official of defendant to plaintiff's attorney sheds more light upon the status of defendant as plaintiff's lessee:

5

[Y]ou should be aware that your client, Mrs. Blankenship, has been notified of her continued failure to meet the terms of the lease on 107 E. Holland Street. As a result, the lease on 107 E. Holland Street is no longer in effect and we are presently renting the subject building on a month to month basis.

By letter of December 13, 1993 to plaintiff, the chief financial officer of Century referred to the status of the parties as follows:

We have been advised . . . that the building Century Home Health Care has leased from you at 107 E. Holland Street, Shelbyville, Tennessee has structural problems in the area of the rear basement wall. . . .

As you know, paragraph 7 of the Lease provides that all structural repairs are the responsibility of the lessor.

Finally, in a letter from Century from defendant's secretary to plaintiff dated December 16, 1993, the author makes the following references:

By letter dated December 13, 1993, I advised you of significant structural problems with the building Century leases from you under the terms of the lease dated January 1, 1992.

. . . .

Accordingly, due to your breach of the lease and the condition of the premises, please be advised the Century is terminating the lease effective Sunday, January 9, 1994. . . .

In Sander v. Piggly Wiggly Stores, Inc., 95 S.W.2d 1266, 1270 (Tenn. App. 1936), the middle section of this court held that where defendant Southern Stores Corporation went into possession of the premises, acknowledged the lease, and paid rent for more than two years, an assignment of the lease was presumed where the assignor goes into possession and pays rent. In addition, this court cited with approval a New York case to the effect that where a person other than the lessee is shown to be in possession of the leasehold premises the law presumes that the lease has been assigned to him. Id. (citing Mann v. Ferdinand Much Brewery, 121 N.E. 746, 747 (N.Y. 1919)).

In considering the record, particularly, the language used by defendant in the various letters written to plaintiff and plaintiff's lawyer, defendant stands in the position

6

of an assignee and a privity of estate is therefore created between defendant and plaintiff as lessor. In our opinion, the evidence does not preponderate against the finding of the trial court that defendant was bound by the terms of South Central's lease with plaintiff. Defendant's reliance upon First American Nat'l Bank v. Chicken Sys. of America., Inc., 616 S.W.2d 156, 158 (Tenn. App. 1980) is misplaced. There was a second assignment, or ?reassignment" of the lease in First American, which we do not have in this case. The defendant's contention that the abandonment of the premises by itself constitutes a reassignment is without merit. Defendant's relinquishment of the leased premises amounted to nothing more than abandonment. In order for this type of relinquishment of the lease to terminate defendant's duty to pay rent for the remainder of the lease term, there must be some proof to the effect that the lessor, plaintiff in this case, agreed to terminate the lease, or that defendant assigned the lease to another tenant. Charleston Mining & Mfg. Co. v. American Agricultural Chem. Co., 150 S.W. 1143, 1145 (Tenn. 1911). Defendant has cited no authority for its proposition that its relinquishment of the leased premises amounted to a "reassignment" to plaintiff.

We now consider the remaining portion of this issue to the effect that defendant was justified in terminating the lease based upon the building code violations found by the City of Shelbyville's representative. In essence, what defendant seeks to have this court hold is that the discovery of building code violations during the term of an existing lease provides the innocent party an immediate excuse of either not performing or terminating a lease. The record reflects that the code violations were not discovered until some twenty months after plaintiff and South Central entered into the lease and several months after defendant occupied the premises under the lease and paid its rent to plaintiff. Defendant presented no evidence to the effect that the "violations" actually constituted such an unreasonable interference with its use and enjoyment of the building as to constitute a constructive eviction. There was no evidence presented regarding the extent of the structural damage, the magnitude of the water leak, or whether defendant had supplies stored in the affected areas, nor was there any evidence that any of its supplies or computers had been an any way adversely affected by this condition. Defendant's

7

prediction that the code violations could conceivably affect their business is nothing more than speculation.

Defendant relies upon Smith v. Owen, 841 S.W.2d 828 (Tenn. App. 1992) for its contention that property owners are barred from leasing property to another unless the conditions of the property comply in every respect to certain sections of the Standard Housing Code, adopted by the City of Shelbyville. This is an exaggerated stretch of the holding of the middle section of this court in Smith. As to this issue, Smith stands for the proposition that it is against the law—i.e., a duty placed on the property owner, to lease to another any existing building unless that building complies with each and every requirement enumerated in Chapter 3 of the Housing Code. Id. at 831. The effect of this prohibition is the creation of negligence per se liability upon the lessor in the event damage or harm is done to another growing out of the occupancy and use of the leasing of these premises to another. Id. We find that this aspect of this issue is without merit.

## II. Mitigation of Damages

We next consider whether the trial court erred in finding that plaintiff had mitigated her damages. The rule in this state as to the duty to mitigate on the part of the non-breaching party is as follows:

> Generally, one who is injured by the wrongful or negligent act of another, whether by tort or breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage, and to the extent that his damages are the result of his active and unreasonable enhancement thereof, or due to his failure to exercise such care and diligence, he cannot recover.

Cook & Nichols, Inc. v. Peat Marwick, Mitchell & Co., 480 S.W.2d 542, 545 (Tenn. App. 1971). The burden is on the defendant who breached the contract to prove what amount should be offset in mitigation damages. State ex rel. Chapdelaine v. Torrence, 532 S.W.2d 542, 550 (Tenn. 1975), cert. denied, 425 U.S. 953 (1976).

8

Plaintiff testified that after defendant vacated the premises in January 1994, she placed a ?for rent" sign in the building window and in addition ran a five (5) day classified ad in the Shelbyville newspaper. She stated that she also spoke with a local banker and a businessman about leasing the premises. Plaintiff also offered to rent the building to a prospective tenant for $600 to $700 per month, a significant decrease from the $1,650 per month rent under the lease. Notwithstanding, she was not able to rent the building during the balance of defendant's term. Defendant stated no evidence of any other type of advertising that plaintiff could have done that might possibly have rented the building. Rather, defendant contends that because of its interpretation of Smith v. Owen, plaintiff was barred from renting the premises because of building code violations, and therefore plaintiff would not be entitled to any damages. We have reread Smith v. Owen, and do not find such a holding in that case nor do we deem it subject to interpretation that defendant would have us give it. Therefore, we will not extend the rule in Smith to support defendant's contentions. In our opinion, the evidence does not preponderate against the trial court's finding in this regard nor has defendant met its burden placed upon it by our case law. This issue is without merit.

## III. The Award of Future Rent Payments

In the event of a breach of the lease, it was provided therein that plaintiff should receive the "worth" of rent payments due at the time of termination, the time of award, and for the remainder of the lease period.[1] The trial court awarded plaintiff rent in the stated lease amount of $1,650 per month from January 9, 1994, the date defendant

---

[1]The applicable portion of the lease reads as follows:
19. Remedies of Owner on Default: In the event of any breach of this lease by Lessee, Lessor may, at his option, terminate the lease and recover from Lessee:
(a) the worth at the time of award of the unpaid rent which was earned at the time of termination;
(b) the worth at the time of award of the amount by which the unpaid rent would have been earned after termination until the time the award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; and
(c) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that Lessee proves could have reasonably avoided . . . .

9

abandoned the premises, until October 20, 1994, the date of the award. In addition the court awarded plaintiff $1,650 per month from October 20, 1994 until December 31, 1995, the expiration date of the lease. Defendant contends that the trial court erred in so doing, asserting that the court should have discounted to their present value future rent payments due under the lease.

We agree. We have no Tennessee case directly on point but we have found what we consider to be relevant and persuasive authority. In In re United American Financial Corp., 55 B.R. 117, 119-20 (Bankr. E.D. Tenn. 1985), the court had under consideration the very same issue we are considering here—whether a party can be given an accelerated recovery in full of all rental payments under a lease or whether the court will reduce the deficiency to a sum equivalent to the present cash value of the accelerated rental payments. The court stated:

> To the extent that the plaintiff's recovery will encompass damages reflecting future rental payments which would not yet have come due under the lease, that recovery must be discounted to present value.
>
> The parties have not cited, and the court is not aware of, any Tennessee authority specifically addressing this question. However, under the most basic principle of contract damages the injured party is entitled only to be placed, as nearly as possible, in the same position as he would have been had the contract been performed. He is not entitled to be placed in a better position by the recovery of damages than he would have been had the contract been fully performed. Action Ads, Inc. v. William B. Tanner Co., 592 S.W.2d 572, 575 (Tenn. App. 1977); Great American Music Machine, Inc. v. Mid-South Record Pressing Co., 393 F. Supp. 877 (M.D. Tenn. 1975); Clark v. Ferro Corporation, 237 F. Supp. 230 (E.D. Tenn. 1964). See also Restatement (Second) of Contracts § 344 (1981).

Id. at 119.

In addition, the bankruptcy court stated that in discounting the future rental payments to present value, the court should utilize a rate of interest statutorily mandated for the calculation of post-judgment interest. Id. at 120. With this we also agree. Accordingly, we reverse the trial court's judgment in this respect pertaining to the accelerated balance of rent due under the lease from the date of judgment until the

expiration date of the lease, and remand this case to the trial court, as to this issue, with instructions to discount the future rental payments to be awarded utilizing the interest rate mandated for post-judgment interest in accordance with T.C.A. § 47-14-121 (1995).

## IV. Plaintiff's Attorney Fees

Finally, defendant contends that the trial court erred in awarding attorney's fees to plaintiff's counsel in the amount awarded, and, in light of this record in awarding attorney fees at all. To keep matters in context, the lease under which the parties are operating provided that,

> In case suit should be brought for recovery of the premises, or for any sum due hereunder, or because of any act which may arise out of the possession of the premises, by either party, the prevailing party shall be entitled to all costs incurred in connection with such action, including a reasonable attorney's fee.

At trial, plaintiff put on no proof as to the amount of time and labor expended on this case or what a "reasonable" fee under those circumstances would be. The only mention of attorney fees by plaintiff was in his closing and opening arguments. Plaintiff's counsel concluded his opening statement to the court with the following:

> I guess the last item on my list, and first in my heart, would be that the lease calls for attorney's fees; and we would ask the court for reasonable attorney's fees; and we would submit to the court that this has been an on-going process from about August of '93 to date.

In the trial court's memorandum opinion the court said simply: "an attorney's fee of 15%, standard in this jurisdiction, will be added pursuant to paragraph 22 of the lease."

We think this was error on the part of the trial court, not only in awarding plaintiff a fee of 15% of the amount of the judgment, but in awarding an attorney fee at all. We base this conclusion upon a holding by the western section of this court in <u>Cummings &</u>

Co. v. Mascari, 402 S.W.2d 719, 727 (Tenn. App. 1965). In Cummings, the contract sued on provided that in the event the lessor was required to institute suit with the enforcement of any obligations of the lease of the lessee, and lessee agreed to pay "a reasonable attorney's fee." Id. at 722. The trial court entered judgment for defendant and dismissed plaintiff's suit. Id. at 722-23. On appeal, this court determined that plaintiff was entitled to a reversal by the trial court and have a judgment entered in this court. Id. at 727. In considering the various elements of plaintiff's damages, this court stated:

> We cannot, however, allow attorney's fees in the instant case, because the contract provides merely for a "reasonable attorney's fee" and no proof was offered in the lower court as to what would constitute a reasonable attorney's fee.

Id.

This Court disallowed the recovery of attorney's fees based upon an earlier opinion of this court in Nu-Way Ice Cream Mach. Co. v. Pig'n Whistle, wherein we stated in part:

> In the absence of any proof as to what would be a reasonable attorney's fee, and the failure upon the part of complainant to make any proof on that subject, we think that it stands as waived, and the chancellor was in error in fixing any amount unless there was an agreement by both parties that the chancellor could fix the amount without evidence, and no such agreement appears to have been made.

Cummings & Co., 402 S.W.2d at 727 (quoting Nu-Way Ice Cream Mach. Co. v. Pig-n Whistle, 65 S.W.2d 575, 579 (Tenn. App. 1933). We resolve this issue in favor of defendant.

Accordingly, we reverse the trial court's award of future rent payments and remand this aspect of the case to the trial court for further action not inconsistent with this opinion. We reverse the award of attorney fees to plaintiff. Otherwise, we affirm the trial court in all respects. Costs in this cause are taxed one-half to plaintiff and one-half to defendant, for which execution may issue if necessary.

12

_____  TOMLIN, Sr. J.


_____  HIGHERS, J.          (CONCURS)


_____  FARMER, J.          (CONCURS)